

## IN THE UNITED STATES DISTRICT COURT
### FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA )<br><br>and )<br><br>STATE OF ILLINOIS )<br><br> and )<br><br>*ex rel.* KATHERINE VERHULST )<br>1331 West Melrose Street )<br>Chicago, IL 60657 )<br><br> )<br> Plaintiffs, )<br> )<br>vs. )<br> )<br>QUALITY THERAPY & )<br>CONSULTATION, INC. )<br>16170 Kingsport Rd. )<br>Orland Park, IL 60467 )<br> )<br>Serve: )<br>Michael S. Roberts )<br>55 West Monroe STE 1700 )<br>Chicago, IL 60603 )<br> )<br>and )<br> )<br>THE CARLTON AT THE )<br>LAKE, INC. )<br>725 W Montrose Ave )<br>Chicago, IL 60613 )<br> )<br>Serve: )<br>Susan C. Lewis )<br>6633 N. Lincoln Ave. )<br>Lincolnwood, IL 60645 )<br> )<br>and )<br> )<br>LAKE SHORE HEALTHCARE )<br>AND REHABILITATION )<br>CENTRE LLC )<br>7200 N. Sheridan Rd. )<br>Chicago, IL 60626 ) | Case No.: 14-cv-2083<br><br>**FILED UNDER SEAL**<br>Pursuant to 31 U.S.C. § 3730<br>(False Claims Act) |

**FILED**
JUL 18 2016
THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

LAW OFFICES
**GOLDMAN & EHRLICH**
20 SOUTH CLARK STREET
SUITE 500
CHICAGO, ILLINOIS 60603
(312)332-6733

ARDC # 06210828

Serve: )
Stanley Kim )
4600 W. Touhy Ave. #200 )
Lincolnwood, IL 60712 )
 )
and )
 )
RIDGEVIEW REHAB & )
NURSING CENTER )
6450 N. Ridge Ave. )
Chicago, IL 60626 )
 )
Serve: )
Registered Agent )
191 N. Wacker Dr. STE 1800 )
Chicago, IL 60606 )
 )
and )
 )
THE WESTWOOD MANOR, INC. )
2444 W. Touhy )
Chicago, IL 60645 )
 )
Serve: )
Joseph Liberman )
2444 W. Touhy )
Chicago, IL 60645 )
 )
and )
 )
WINSTON MANOR )
CONVALESCENT & )
NURSING HOME )
2155 W Pierce Ave )
Chicago, IL 60622 )
 )
Serve: )
Marvin Mermelstein )
6500 N. Hamlin Ave. )
Lincolnwood, IL 60712 )
 )
and )
 )
BALMORAL HOME, INC. )
2055 W. Balmoral Ave. )
Chicago, IL 60625 )

LAW OFFICES
**GOLDMAN & EHRLICH**
20 SOUTH CLARK STREET
SUITE 500
CHICAGO, ILLINOIS 60603
(312)332-6733

ARDC # 06210828

2

Serve:                                         )
**Marvin Mermelstein**                         )
**6500 N. Hamlin Ave.**                        )
**Lincolnwood, IL 60712**                      )
                                               )
**and**                                        )
                                               )
**ATRIUM HEALTH CARE**                         )
**CENTER LTD.**                                )
**1425 W. Estes**                              )
**Chicago, IL 60626**                          )
                                               )
Serve:                                         )
**Registered Agent**                           )
**191 N. Wacker Dr. STE 1800**                 )
**Chicago, IL 60606**                          )
                                               )
**and**                                        )
                                               )
**NORRIDGE GARDENS**                           )
**7001 Cullom Avenue**                         )
**Norridge, IL 60706**                         )
                                               )
Serve:                                         )
**Abraham Gutnicki**                           )
**Resident Agent**                             )
**4711 Golf Road, Suite 200**                  )
**Skokie, IL 60076**                           )
                                               )
       **Defendants.**            )
_____)

LAW OFFICES
**GOLDMAN & EHRLICH**
20 SOUTH CLARK STREET
SUITE 500
CHICAGO, ILLINOIS 60603
(312)332-6733

ARDC # 06210828

3

## FIRST AMENDED COMPLAINT

Relator-Plaintiff Katherine Verhulst ("Relator'), by and through her attorneys, brings this False Claims Act Complaint, on behalf of the United States of America and the State of Illinois, against Defendants Quality Therapy & Consultation ("QTC"), and The Carlton at the Lake, Inc., Lake Shore HealthCare and Rehabilitation Centre, LLC, Ridgeview Rehab & Nursing Center, The Westwood Manor, Inc., Winston Manor Convalescent and Nursing Home, Balmoral Home, Inc., and Atrium Health Care Center Ltd, and Norridge Gardens. ("Defendant Facilities"). Defendant Quality Therapy & Consultation is an Illinois Corporation that provides therapists and therapy services to Skilled Nursing facilities and Mental Health facilities in the Chicago area. The other named Defendants are skilled nursing facilities who contract with Defendant QTC to provide physical, speech, and occupational therapy treatment to its patients, many of whom are on psychotropic medications. Defendant QTC and Defendant Facilities (collectively "Defendants") conduct business and are located in the Northern District of Illinois.

### I. NATURE OF THE CASE

1. This is an action to recover damages and civil penalties on behalf of the United States of America arising out of false claims approved and presented by Defendants to obtain millions of dollars annually from the United States Department of Health and Human Services' Medicare and Medicaid Programs and Illinois' Medicaid program administered by the Illinois Deparment of Public Aid. Defendants conspired with each other to wrongfully manipulate data in order to charge Medicare and Medicaid for uncovered and unskilled treatment in addition to medical treatment that was unreasonable and unnecessary.

LAW OFFICES
**GOLDMAN & EHRLICH**
20 SOUTH CLARK STREET
SUITE 500
CHICAGO, ILLINOIS 60603
(312)332-6733

ARDC # 06210828

4

2.     Medicare reimburses nursing facilities a daily rate to provide skilled nursing and skilled rehabilitation therapy services to qualifying Medicare patients.  The rate Medicare pays to the facilities depends on the rehabilitation needs of the patients and the level and length of treatment provided.

3.     QTC conspired with Defendant Facilities to overbill Medicare and Medicaid for therapy services that were unnecessary and/or not provided, and knowingly caused false and fraudulent claims to be presented for payment or approval to the United States and Illinois State governments.  QTC forced its therapists to increase the therapy minutes and length of treatment for patients to maximize the amount the Defendant Facilities billed to Medicare.  Where a therapist did not evaluate a patient at one of the two highest (and costliest) levels of therapy needs, QTC ignored these evaluations and forced the therapists to modify their original evaluations, or would replace therapists who refused to alter their evaluations with new therapists who would falsify a new patient evaluation according to QTC's instructions.  QTC required its therapists to perform unskilled tasks in order to fulfill the increased therapy minutes and treatment lengths which, if accurately reported, would not be tasks covered by Medicare. QTC also required therapists to treat patients who should have been discharged because they did not need therapy or no longer needed it so that they could bill Medicare additional unnecessary services and minutes.

4.     Defendant Facilities had actual knowledge of QTC's actions, or acted in deliberate ignorance or with reckless disregard as to the truth or falsity of QTC's actions, and knowingly presented false claims to Medicare for therapy that is medically unreasonable and unnecessary, as well as for unskilled therapy services, and used false records and statements to support these false

LAW OFFICES
**GOLDMAN & EHRLICH**
20 SOUTH CLARK STREET
SUITE 500
CHICAGO, ILLINOIS 60603
(312)332-6733

ARDC # 06210828

claims. Accordingly, this action is brought to recover treble damages and civil penalties under the False Claims Act, 31 U.S.C. §§ 3729-33 ("FCA").

5.       Defendant similarly defrauded the state of Illinois through its Medicaid program in violation of The Illinois False Claims Act, 740 Ill. Comp. Stat. 175/1 (2011), *et seq.*

## I.JURISDICTION AND VENUE

1.       This Court has jurisdiction over the Defendants under 28 U.S.C. §§ 1331 & 1345 and 31 U.S.C. § 3730, and may exercise personal jurisdiction over the Defendants because the Defendants all reside and/or transact business in this District, or committed acts proscribed by 31 U.S.C. § 3729 and 740 Ill. Comp. Stat. 175/3 in this District.

2.       This Court has supplemental jurisdiction over state law claims under 28 U.S.C. § 1367.

3.       Venue is proper in the Northern District of Illinois pursuant to 31 U.S.C. § 3732(a) and 28 U.S.C. § 1391(b) because the Defendants all reside in this District, and it is where a substantial part of the events or omissions giving rise to the claims occurred.

## I.PARTIES

1.       Plaintiff-Relator Katherine Verhulst ("Relator") is a former employee of Defendant Quality Therapy & Consultation who worked as a licensed occupational therapist for Defendant QTC from July 2013 to November 2013. Relator resides at 1331 West Melrose Street, Chicago, IL 60657. Like all occupational therapists, Relator is trained to provide treatment to develop, recover, or improve the skills needed for daily living and working for injured, ill, or disabled patients. Based upon the pattern and practice of conduct that Relator witnessed, described in more

LAW OFFICES
**GOLDMAN & EHRLICH**
20 SOUTH CLARK STREET
SUITE 500
CHICAGO, ILLINOIS 60603
(312)332-6733

ARDC # 06210828

detail below, Relator learned that Defendant QTC conspired with the Defendant Facilities to defraud the government and knowingly falsified documents and manipulated patients' therapy needs in order to achieve higher reimbursement from Medicare and Medicaid.

2.     Defendant QTC is a corporation that provides physical, occupational, and speech therapy services and is located at 16170 S Kingsport Rd, Orland Park, IL 60467. Defendant QTC consistently attempted to force Relator and forced other various employee-therapists to falsify documents that fraudulently required patients to receive medically unnecessary therapy in order to exhaust Medicare and Medicaid funds.

3.     Defendant The Carlton at the Lake ("Carlton") is a skilled nursing facility located at 725 W Montrose Ave, Chicago, IL 60613. Defendant Carlton contracted with Defendant QTC for QTC to provide physical, occupational, and speech therapy services to its patients. Relator witnessed Defendant Carlton conspire with QTC to defraud the government, and knowingly overcharge Medicare and Medicaid by manipulating and inflating data for rehabilitation and therapy to achieve higher reimbursement rates from Medicare and Medicaid. Defendant Carlton also exaggerated the assisted daily living needs provided to residents by fraudulently inflating its numbers to achieve higher reimbursement rates from Medicare and Medicaid.

4.     Defendant Lake Shore HealthCare and Rehabilitation Centre, LLC ("Lake Shore") is a skilled nursing facility located at 7200 N Sheridan Rd, Chicago, IL 60626. Defendant Lake Shore contracted with Defendant QTC for QTC to provide physical, occupational, and speech therapy services to its patients. Relator witnessed Defendant Lake Shore conspire with QTC to defraud the government, and knowingly overcharge Medicare and Medicaid by manipulating and inflating data for rehabilitation and therapy to achieve higher reimbursement rates from Medicare

LAW OFFICES
**GOLDMAN & EHRLICH**
20 SOUTH CLARK STREET
SUITE 500
CHICAGO, ILLINOIS 60603
(312)332-6733

ARDC # 06210828

7

and Medicaid. Defendant Lakeshore also routinely exaggerated the assisted daily living needs provided to residents by fraudulently inflating its numbers to achieve higher reimbursement rates from Medicare and Medicaid.

5. Defendant Ridgeview Rehab & Nursing Center ("Ridgeview") is a skilled nursing facility located at 6450 N. Ridge Blvd, Chicago, IL 60626. Defendant Ridgeview contracted with Defendant QTC for QTC to provide physical, occupational, and speech therapy services to its patients. Relator witnessed Defendant Ridgeview conspire with QTC to defraud the government, and knowingly overcharge Medicare and Medicaid by manipulating and inflating data for rehabilitation and therapy to achieve higher reimbursement rates from Medicare and Medicaid. Defendant Ridgeview also routinely exaggerated the assisted daily living needs provided to residents by fraudulently inflating its numbers and achieve higher reimbursement rates from Medicare and Medicaid.

6. Defendant The Westwood Manor, Inc. ("Westwood Manor") is a skilled nursing facility located at 2444 W Touhy, Chicago, IL 60645. Defendant Westwood Manor contracted with Defendant QTC for QTC to provide physical, occupational, and speech therapy services to its patients. Relator witnessed Defendant Westwood Manor conspire with QTC to defraud the government, and knowingly overcharge Medicare and Medicaid by manipulating and inflating data for rehabilitation and therapy to achieve higher reimbursement rates from Medicare and Medicaid. Defendant Westwood Manor also routinely exaggerated the assisted daily living needs provided to residents by fraudulently inflating its numbers to achieve higher reimbursement rates from Medicare and Medicaid.

LAW OFFICES
**GOLDMAN & EHRLICH**
20 SOUTH CLARK STREET
SUITE 500
CHICAGO, ILLINOIS 60603
(312)332-6733

ARDC # 06210828

8

7. Defendant Winston Manor Convalescent and Nursing Home ("Winston Manor") is a skilled nursing facility located at 2155 W Pierce Ave, Chicago, IL 60622. Defendant Winston Manor contracted with Defendant QTC for QTC to provide physical, occupational, and speech therapy services to its patients. Relator witnessed Defendant Winston Manor conspire with QTC to defraud the government, and knowingly overcharge Medicare and Medicaid by manipulating and inflating data for rehabilitation and therapy to achieve higher reimbursement rates from Medicare and Medicaid. Defendant Winston Manor also routinely exaggerated the assisted daily living needs provided to residents by fraudulently inflating its numbers to achieve higher reimbursement rates from Medicare and Medicaid.

8. Defendant Balmoral Home, Inc. is a skilled nursing facility located at 2055 W Balmoral Ave, Chicago, IL 60625. Defendant Balmoral Home, Inc. contracted with Defendant QTC for QTC to provide physical, occupational, and speech therapy services to its patients. Relator witnessed Defendant Balmoral Home, Inc. conspire with QTC to defraud the government, and knowingly overcharge Medicare and Medicaid by manipulating and inflating data for rehabilitation and therapy to achieve higher reimbursement rates from Medicare and Medicaid. Defendant Balmoral Home, Inc. also routinely exaggerated the assisted daily living needs provided to residents by fraudulently inflating its numbers to achieve higher reimbursement rates from Medicare and Medicaid.

9. Defendant Norridge Gardens, is a skilled nursing facility located at 7001 West Cullom Ave, Norridge 60706. Defendant Norridge Gardens contracted with Defendant QTC for QTC to provide physical, occupational, and speech therapy services to its patients. At a subsequent position obtained by Relator for a different company, she learned that Defendant Norridge Gardens

LAW OFFICES
**GOLDMAN & EHRLICH**
20 SOUTH CLARK STREET
SUITE 500
CHICAGO, ILLINOIS 60603
(312)332-6733

ARDC # 06210828

conspired with QTC to defraud the government, and knowingly overcharge Medicare and Medicaid by manipulating and inflating data for rehabilitation and therapy to achieve higher reimbursement rates from Medicare and Medicaid.

## I.      FALSE CLAIMS ACT

1.      The FCA provides that any person who knowingly presents or causes to be presented a false or fraudulent claim for payment or approval to the Government is liable for a civil penalty of between $5,500 and $11,000 per claim plus three times the amount of damages the Government sustained.  31 U.S.C. § 3729(a); 28 C.F.R. § 85.3.  For purposes of the FCA, "the terms 'knowing' and 'knowingly' mean that a person . . . (i) has actual knowledge of the information; (ii) acts in deliberate ignorance of the truth or falsity of the information; or (iii) acts in reckless disregard of the truth or falsity of the information." 31 U.S.C. § 3729(b).  "[N]o proof of specific intent to defraud" is required for a successful claim under the FCA.  *Id.*

## I.      ILLINOIS FALSE CLAIMS ACT

1.      The Illinois False Claims Act, 740 ILCS 175/1, *et seq.*,  provides that any person who knowingly presents or causes to be presented a false or fraudulent claim  to the State of Illinois is liable for a civil penalty of between $5,500 and $11,000 per claim plus three times the amount of damages that the State sustained.  740 Ill. Comp. Stat. 175/3 (a)(1)(G) (2010).

2.      For purposes of this Act, "the terms 'knowing' and 'knowingly' mean that a person, with respect to information: (i) has actual knowledge of the information; (ii) acts in deliberate ignorance of the truth or falsity of the information; or (iii) acts in reckless disregard of the truth or falsity of the information."  740 Ill. Comp. Stat. 175/3 (b)(1).  Additionally, "no proof of specific intent to defraud" is required.  *Id.*

LAW OFFICES
**GOLDMAN & EHRLICH**
20 SOUTH CLARK STREET
SUITE 500
CHICAGO, ILLINOIS  60603
(312)332-6733

ARDC # 06210828

# I.THE MEDICARE PROGRAM

**Medicare Generally**

1.     The Medicare Program ("Medicare") is a federally-funded system of health insurance for the elderly and disabled, created under Title XVIII of the Social Security Act, 42 U.S.C. § 1395, *et. seq.*

2.     Medicare is divided into four parts, two of which are relevant here: Medicare Part A and Medicare Part B.  Medicare Part A ("Part A"), the Basic Plan of Hospital Insurance, covers the costs of inpatient hospital services, home health and hospice care, and skilled nursing and rehabilitation care.  Medicare Part B ("Part B"), the Voluntary Supplemental Insurance Plan, covers the cost of physician services and certain other medical services not covered by Part A, including therapy, laboratory, and certain other services.

3.     Providers are required to furnish necessary information to "determine the amounts due" to them under Medicare for proper reimbursement.  42 U.S.C. § 1395l(e)

4.     The Centers for Medicare and Medicaid Services ("CMS") of the Department of Health and Human Services is directly responsible for the administration and supervision of the Medicare program.

**Medicare Part A and Skilled Nursing Facilities**

5.     A "nursing facility" means an institution that is primarily engaged in providing to its residents: (a) skilled nursing care and related services for residents who require medical or nursing care; (b) rehabilitation services for rehabilitation of the injured, disabled, or sick persons; or (c) on a regular basis, health-related care and services to individuals who, because of their

LAW OFFICES
**GOLDMAN & EHRLICH**
20 SOUTH CLARK STREET
SUITE 500
CHICAGO, ILLINOIS  60603
(312)332-6733

ARDC # 06210828

mental or physical condition, require care and services which can be made available to them only through institutional facilities. 42 U.S.C. § 1396r(a)(1).

6.     Medicare Part A covers up to 100 days of skilled nursing and rehabilitation care for a benefit period following a qualifying hospital stay of at least three consecutive days and certain other conditions. 42 U.S.C. § 1395d(a)(2)(A); 42 C.F.R. § 409.61(b)-(c).

7.     The conditions Medicare imposes on skilled nursing facilities in Part A include: (1) that the patient requires skilled nursing care or skilled rehabilitation services, or both, on a daily basis; (2) that the daily "skilled services" must be services that can only be provided in a skilled nursing facility on an inpatient basis; and (3) that the services are provided to address a condition for which the patient received treatment during a qualifying hospital stay or that arose while the patient was receiving care in a skilled nursing facility. 42 U.S.C. § 1395f(a)(2)(B); 42 C.F.R. § 409.31(b).

8.     Medicare also requires that a physician or other qualified practitioners certify that the conditions discussed above are met at the time of a patient's admission to the nursing facility and to re-certify a patient's continued need for skilled rehabilitation therapy services at specified intervals in the future.    42 U.S.C. § 1395f(a)(2)(B); MEDICARE GENERAL INFORMATION, ELIGIBILITY, AND ENTITLEMENT MANUAL, Ch. 4 § 40.3.

9.     To be considered a skilled service, "the service must be so inherently complex that it can be safely and effectively performed only by, or under the supervision of, professional or technical personnel." 42 C.F.R. § 409.32(a).    Such personnel include physical therapists, occupational therapists, or speech pathologists. *Id*. at § 409.31(a)(2); *see* MEDICARE BENEFIT POLICY MANUAL, Ch. 8 § 30.2.1.

LAW OFFICES
**GOLDMAN & EHRLICH**
20 SOUTH CLARK STREET
SUITE 500
CHICAGO, ILLINOIS 60603
(312)332-6733

ARDC # 06210828

12

10.     Typically, skilled services do not include personal care services and those services that do not require skilled personnel.  *See* 42 C.F.R. § 409.33(d); MEDICARE BENEFIT POLICY MANUAL, Ch. 8, § 30.2.  Examples of nonskilled services that are not covered by Medicare include: the routine care of the incontinent patient; assistance in dressing, eating, and going to the toilet; periodic turning and positioning in the bed; changes of dressings for uninfected post-operative or chronic conditions; and the general supervision of exercises which have been taught to the patient and the performance of repetitive exercises that do not require skilled rehabilitation personnel for their performance.  MEDICARE BENEFIT POLICY MANUAL, Ch. 8, § 30.5.

11.     When rehabilitation services are the primary services, the key issue for determining whether it is a skilled service is whether the services the patients need <u>require</u> the skills of a therapist or whether they can be provided by non-skilled personnel. *See* MEDICARE BENEFIT POLICY MANUAL 30.2.2 (emphasis added).

12.     Moreover, Medicare Part A will only cover those services that are "reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member." 42 U.S.C. § 1395y(a)(1)(A).  In the context of skilled rehabilitation therapy, this means that the services furnished must be: consistent with the nature and severity of the patient's individual illness, injury, or particular medical needs; consistent with accepted standards of medical practice; and reasonable in terms of duration and quantity. *See* MEDICARE BENEFIT POLICY MANUAL, Ch. 8, § 30.

13.     In order to determine whether the services are "reasonable and necessary," and thus that reimbursement is appropriate, Medicare requires proper and complete documentation of the services rendered to the beneficiaries.  Specifically:

LAW OFFICES
**GOLDMAN & EHRLICH**
20 SOUTH CLARK STREET
SUITE 500
CHICAGO, ILLINOIS  60603
(312)332-6733

ARDC # 06210828

13

> No payment shall be made to any provider of services or other person under this part unless there has been furnished such information as may be necessary in order to determine the amounts due such provider or other person under this part for the period with respect to which the amounts are being paid or for any prior period.

42 U.S.C. § 1395l(e).

## The Medicare Payment System

14.     Under Medicare's prospective payment system ("PPS"), Medicare pays a nursing facility a pre-determined daily rate for each day of skilled nursing and rehabilitation services the facility provides to a patient. *See* 63 Fed. Reg. 26,252, 26,259-60 (May 12, 1998).

15.     The daily PPS rate that Medicare pays a facility depends on the Resource Utilization Group ("RUG") to which the beneficiary is assigned. Each RUG level reflects the anticipated costs associated with providing nursing and rehabilitation services to beneficiaries with similar needs.

16.     There are five rehabilitation RUG levels for those beneficiaries who require rehabilitation therapy: Rehab Ultra High ("RU"); Rehab Very High ("RV"); Rehab High ("RH"); Rehab Medium ("RM"); and Rehab Low ("RL").

17.     The rehabilitation RUG level to which a patient is assigned depends upon the number of skilled minutes and the number of therapy disciplines the patient received during a seven day assessment period (known as the "look-back period"). The chart below demonstrates the current RUG system:

LAW OFFICES
**GOLDMAN & EHRLICH**
20 SOUTH CLARK STREET
SUITE 500
CHICAGO, ILLINOIS 60603
(312)332-6733

ARDC # 06210828

| Rehabilitation RUG Level | Requirements to Attain RUG Level |
|---|---|
| **Ultra High** | **Minimum 720 minutes per week; total therapy combined from at least two therapy disciplines; one therapy discipline must be provided at least 5 days per week** |
| **Very High** | **Minimum 500 minutes per week; one therapy discipline must be provided at least 5 days per week** |

14

| High | Minimum 325 minutes per week; one therapy discipline must be provided at least 5 days per week |
| Medium | Minimum 150 minutes per week; therapy must be provided at least 5 days per week but can be any mix of therapy disciplines |
| Low | Minimum 45 minutes per week; therapy must be provided at least 3 days per week but can be any mix of therapy disciplines |

*See* 63 Fed. Reg. at 26,258.

18.    The Ultra High RU level is the costliest and is "intended to apply only to the most complex cases requiring rehabilitative therapy well above the average amount of service time." 63 Fed. Reg. at 26,258. "This translates into higher charges for therapy services, both because treatment is more frequent and complex, and because length of stay is longer than for other skilled rehabilitation groups." *Id.*

19.    In addition to reflecting a patient's rehabilitation therapy needs, each RUG level is subdivided into different categories depending on the amount of assistance a beneficiary needs with activities of daily living ("ADL"), like eating, transferring, and toileting. *See* 63 Fed. Red. at 26,263; QUESTIONABLE BILLING BY SKILLED NURSING FACILITIES, DEP'T OF HEALTH AND HUMAN SERVS., OFFICE OF THE INSPECTOR GEN. i-ii, *available at* https://oig.hhs.gov/oei/reports/oei-02-09-00202.pdf (Dec. 2010). For example, a patient who requires a high level of assistance can be categorized into a RUG with a high ADL score, and someone who requires less assistance can be categorized into the same RUG with a lower ADL score. *Id.* Medicare reimburses more for a RUG with high ADL scores than the same RUG with a low ADL score. *See id.*

20.    Medicare requires nursing facilities to periodically assess each patient's clinical

LAW OFFICES
**GOLDMAN & EHRLICH**
20 SOUTH CLARK STREET
SUITE 500
CHICAGO, ILLINOIS 60603
(312)332-6733

ARDC # 06210828

condition, functional status, and expected and actual use of services, and submit those findings using the Minimum Data Set ("MDS"). *See* 42 CFR § 483.20; 63 Fed. Red. at 26,265. The MDS is a comprehensive assessment tool that establishes and records a resident's functional capacity, problems, and care needs. 42 CFR § 483.20; 63 Fed. Red. at 26,265. Each facility must submit the MDS to CMS for approval by CMS prior to billing Medicare for services. 42 CFR § 483.20; 63 Fed. Red. at 26,265.

21.    With respect to the provision of therapy services, the number of therapy minutes provided to the patient determines the patient's RUG level. With respect to the provision of ADL care, the level of dependence on the staff determines the resident's ADL score and corresponding RUG level. The RUG category assigned to the resident determines the amount of Medicare reimbursement that the nursing home will receive per day for each resident's stay.

22.    The RUG level is to be readjusted periodically as the resident's needs are reassessed and a revised MDS is created and submitted to CMS. Skilled nursing facilities must conduct these assessments on or about the 5th, 14th, 30th, 60th, and 90th days of a Part A stay. *See* 42 CFR § 413.343. Accordingly, if a patient exhausts his or her 100-day stay for Medicare Part A, he or she should have had at least five assessments. *See* CHANGES IN SKILLED NURSING FACILITIES BILLING IN FISCAL YEAR 2011, CTRS. FOR MEDICARE & MEDICAID SERVS. 2, *available at* http://oig.hhs.gov/oei/reports/oei-02-09-00204.pdf (Jul. 8, 2011).

23.    The MDS collects information on various criteria, and Section P in particular collects information on the quantity and type of skilled rehabilitation therapy the facility provided to a patient during the look-back period. Section P shows how many days and minutes of therapy a nursing facility provided to a patient in each therapy discipline, and this information directly

LAW OFFICES
**GOLDMAN & EHRLICH**
20 SOUTH CLARK STREET
SUITE 500
CHICAGO, ILLINOIS 60603
(312)332-6733

ARDC # 06210828

impacts a patient's assigned RUG level and the amount Medicare reimburses a facility, as discussed above.

24.    Completion of the MDS is a prerequisite to payment under Medicare. *See* 63 Fed. Reg. at 26,265. The MDS requires the provider to certify that: "To the best of my knowledge, this information was collected in accordance with applicable Medicare and Medicaid requirements. I understand that this information is used as a basis for ensuring that residents receive appropriate and quality care, and as a basis for payment from federal funds." Minimum Data Set (MDS) – Version 2.0 for Nursing Home Resident Assessment and Car Screening.

25.    A patient's RUG information is incorporated into the Health Insurance Prospective Payment System (HIPPS) code, which Medicare uses to determine the payment amount owed to the nursing facility. The HIPPS code must be included in the CMS-1450 (the standard claim form to bill Medicare Fee-For-Service (FFS) Contractors), which nursing facilities submit electronically to Medicare for payment. *See* Medicare Claims Processing Manual, Ch. 25, § 75.5. Medicare payment will depend largely on the HIPPS code the nursing facility submitted as part of the CMS-1450. *See* 63 Fed. Reg. at 26,267; Medicare Claims Processing Manual, Ch. 25, § 75.5.

**Medicare Part B**

26.    Medicare Part B pays for physician's services and for non-physician medical or other health services when provided by a participating hospital to an inpatient of a skilled nursing facility once the patient has exhausted their Part A benefits. *See* Medicare Claims Processing Manual, Ch. 7, § 10.1.1. Part B generally starts following the end of the 100 days of Part A coverage for inpatient skilled nursing facility care, and reimburses nursing facilities for services, including physical therapy, occupational therapy, and speech therapy so long as they are certified and ordered by a physician as medically necessary.

LAW OFFICES
**GOLDMAN & EHRLICH**
20 SOUTH CLARK STREET
SUITE 500
CHICAGO, ILLINOIS 60603
(312)332-6733

ARDC # 06210828

17

## I. THE MEDICAID PROGRAM

1.    Medicaid is a joint federal-state program that provides health care benefits for low income individuals and the disabled, among other certain groups of people. *See* 42 U.S.C. § 1396, *et seq.*

2.    Within broad national guidelines established by federal statutes, regulations, and policies, each state establishes its own eligibility standards; determines the type, amount, duration, and scope of services; sets the rate of payment for services; and administers its own program. *Medicaid Program Description and Legislative History*, U.S. SOCIAL SEC. ADMIN., http://www.ssa.gov/policy/docs/statcomps/supplement/2011/medicaid.html. The Illinois Medicaid program is called Illinois Public Aid and is administered by the Illinois Department of Public Aid.

3.    The federal government pays a share of the medical assistance expenditures under each state's Medicaid program, called the Federal Medical Assistance Percentage ("FMAP"), and is based on the state's per capita income compared to the national average. *See* 42 U.S.C. § 1396d(b); *see also* BARBARA S. KLEES, ET AL., BRIEF SUMMARIES OF MEDICARE & MEDICAID, CTRS. FOR MEDICARE & MEDICAID SERVS. (Nov. 1, 2010), *available at* http://www.cms.gov/Research-Statistics-Data-and-Systems/Statistics-Trends-and-Reports/MedicareProgramRatesStats/downloads/MedicareMedicaidSummaries2010.pdf.

4.    Like Medicare, Medicaid reimburses medical care only if it is "reasonable and necessary" for the diagnosis or treatment of illness or injury. 42 U.S.C. § 1395y(a)(1)(A).

## I. 2008 NOTIFICATION TO SKILLED NURSING FACILITIES THAT MEDICALLY UNNECESSARY OR INFLATED REHABILITATION SERVICES ARE ILLEGAL AND CAN CONSTITUTE FCA VIOLATIONS

1.    It is common knowledge that billing Medicare and Medicaid for medically unnecessary services of any kind is illegal and that Medicare and Medicaid only pay for skilled,

LAW OFFICES
**GOLDMAN & EHRLICH**
20 SOUTH CLARK STREET
SUITE 500
CHICAGO, ILLINOIS 60603
(312)332-6733

ARDC # 06210828

rehabilitative therapy services that are reasonable and necessary and consistent with the particular needs of a patient's illness. Nonetheless, the HHS, Office of Inspector General ("HHS-OIG") put skilled nursing facilities and providers such as Defendants on specific notice in September 2008 that billing federal health care programs, such as Medicare and Medicaid, for medically unnecessary rehabilitation services are a particular area of concern that could subject them to FCA liability.

2.     In September 2008, the HHS-OIG published supplemental guidance to skilled nursing facilities concerning, in part, the "[s]ubmission of accurate claims." HHS-OIG Supplemental Compliance Program Guidance for Nursing Homes, 73 Fed. Reg. 56,832 and 56,839-40 (Sept. 30, 2008).  The guidance stated that:

> **Nursing facilities must submit accurate claims to Federal health care programs. Examples of false or fraudulent claims include . . . claims for services that are not medically necessary . . . [such that s]ubmitting a false claim, or causing a false claim to be submitted, to a Federal health care program may subject the individual, the entity, or both to criminal prosecution, civil liability (including treble damages and penalties) under the False Claims Act, and exclusion from participation in Federal health care programs.**

*Id.* at 56,839.

3.     The guidance noted that one of the four areas of concern for inaccurate claims submissions that could lead to FCA liability is "[t]herapy [s]ervices," stating that the "improper utilization of therapy services to inflate the severity of RUG classifications and obtain additional reimbursement . . . [were] practices [that] may result in the submission of false claims." *Id.* at 56,840.

4.     HHS-OIG also explained that, "[u]nnecessary therapy services may place frail but otherwise functioning residents at risk for physical injury, such as muscle fatigue and broken

LAW OFFICES
**GOLDMAN & EHRLICH**
20 SOUTH CLARK STREET
SUITE 500
CHICAGO, ILLINOIS  60603
(312)332-6733

ARDC # 06210828

bones, and may obscure a resident's true condition, leading to inadequate care plans and inaccurate RUG classifications." *Id.* The HHS-OIG "strongly advise[d] nursing facilities to develop policies, procedures and measures to ensure that residents are receiving medically appropriate therapy services." *Id.*

## I.FACTS

1.    QTC is an agency that provides physical, occupational, and speech therapy to patients who are being treated in skilled nursing facilities. QTC enters into contracts with these skilled nursing facilities to provide therapy services to the facilities' patients for the time period specified in the contract.

2.    Defendant QTC hired Relator in July of 2013 to work as an occupational therapist. Relator's duties included visiting the Defendant Facilities and evaluating patients. Relator then documented the specific therapeutic activities appropriate for each patient, the number of minutes that the therapy should have been performed, and the overall length of treatment.

3.    After Relator evaluated a patient, she then presented that information to a QTC supervisor who managed that particular Defendant Facility. If Relator's evaluations delineating a treatment plan did not correspond to that patient's treatment being in the top two RUG levels (ultra high or very high), her supervisors consistently changed the level of therapy required and increased the therapy minutes until the treatment corresponded to either the Ultra High or Very High RUG level. These supervisors made these changes without seeing or evaluating the patients. As such, each patient's treatment corresponded to Ultra High or Very High RUG levels—the two highest levels of rehabilitation therapy and the two costliest under Medicare. This meant that the patients received treatment excessive in frequency, duration, and intensity, such that they could not reasonably expect to benefit from the treatment, which was medically unnecessary.

LAW OFFICES
**GOLDMAN & EHRLICH**
20 SOUTH CLARK STREET
SUITE 500
CHICAGO, ILLINOIS 60603
(312)332-6733

ARDC # 06210828

4. In addition to evaluating patients, Relator's duties included treating patients at the Defendant Facilities. Relator treated about six to eight patients per day during the five month period she worked for Defendant QTC. Notably, no patient Relator treated received an assigned RUG level lower than Very High, the second highest level. This practice seemed entirely inconsistent with Relator's prior experience and training, and appeared to be statistically impossible.

5. Often, in fact, Relator went to treat these patients and realized that the RUG level was well above what was needed or that the patient did not need treatment at all. Defendant QTC often required Relator to provide treatment to patients who would not benefit from the therapy because they were unable to participate. Even though Relator expressly told her supervisors there was no occupational treatment she could provide, Relator's supervisors ordered her to perform unskilled tasks, such as feeding, bathing, and changing, that would not be covered under Medicare, in order to fraudulently fill the minutes necessary for treatment at Ultra High or Very High RUG levels.

6. QTC recorded the number of minutes spent with a patient and if the therapist was unable to see a patient for the specific number of minutes required in a day, those minutes would carry over to the next day to ensure that all of the minutes required to meet the particular RUG level were fulfilled. QTC often reminded the therapists that they needed to fill the minutes required by the RUG level, regardless of whether the patient needed to be treated for that many minutes or if the treatment given was unskilled or unnecessary. Plans of care for patients should have been tailored to each patient's particular needs and clinical characteristics. Instead, patients' plans of care were determined so that they exhausted the full period of coverage regardless of patients' conditions, progress, or goals, resulting in medically unnecessary treatment.

LAW OFFICES
**GOLDMAN & EHRLICH**
20 SOUTH CLARK STREET
SUITE 500
CHICAGO, ILLINOIS 60603
(312)332-6733

ARDC # 06210828

7.     At times, Relator evaluated completely physically-debilitated patients who could not possibly benefit from occupational therapy, much less participate in any treatment the Relator would be required by QTC to provide. When Relator discussed this with her supervisors, including Ms. Sarah Chavka, she was told to spend 15-60 minutes with them regardless, and perform unskilled services including, but not limited to, feeding, bathing, and changing, which were then billed to Medicare as skilled tasks required for occupational therapy treatment. In fact, Ms. Chavka encouraged Relator to visit the patient multiple times in one day to maximize the minutes she treated the patient.

8.     Furthermore, Defendant QTC scheduled Relator to treat patients who required no therapy at all and in fact should have been discharged from Defendant Facilities. For example, in early August of 2013, at Defendant Lakeshore Nursing Facility, Defendant QTC assigned Relator to a white female patient in her early sixties who had undergone a knee replacement. At the time, this patient remained highly independent in terms of her self-care and basic transport needs, and could even walk down the street to purchase food. When Relator evaluated/treated her, Relator documented that this patient had met all of her goals. Despite this patient's high functioning, to the best of Relator's knowledge, Defendants QTC and Lakeshore scheduled this patient for therapy no less than 75 minutes a day, 5 times a week. Relator told her QTC supervisor, Ms. Chavka, who was stationed at Lakeshore, that the patient was ready to be discharged as she was meeting all goals. This particular patient also expressed frustration because the Defendants would not discharge her from the facility. Relator pushed for this patient's discharge, but Ms. Chavka refused, *even though the treatment the patient was receiving was medically unnecessary.* Ms. Chavka even told Relator that the patient still had "days left in Medicare" and mandated that

LAW OFFICES
**GOLDMAN & EHRLICH**
20 SOUTH CLARK STREET
SUITE 500
CHICAGO, ILLINOIS 60603
(312)332-6733

ARDC # 06210828

Relator not discharge her. This patient was forced to stay at Defendant Lakeshore until the Medicare funds for her wrongful and unnecessary therapy were exhausted.

9. When Relator refused to perform therapy on those patients who did not require any or all of the treatment, or did not benefit from treatment, Defendant QTC assigned another therapist to the patient to ensure that all of the requisite therapy minutes were performed. As noted, Relator's supervisors even assigned new therapists to reevaluate certain patients who Relator had evaluated to ensure that treatment was maintained at Ultra High or Very High RUG levels, and Medicare funds were exhausted.

10. For example, on or about Saturday, November 16, 2013, Relator discovered that her decision to discharge a patient had been overruled. One week prior, Relator evaluated a young female patient at Defendant Ridgeview and determined that the patient did not need occupational therapy since the patient reached the highest level of independence and her functioning baseline. A week later, Relator returned to Defendant Ridgeview to evaluate another patient and observed that another occupational therapist had been assigned to reevaluate and then provide medically unnecessary therapy for this same female patient that Relator documented should be discharged. Relator discovered that her manager, Elizabeth "Lizzie," replaced Relator with another therapist who reevaluated the female patient, as QTC required, and maintained the patient's unnecessary therapy treatment. QTC's refusal to discharge this patient was the catalyst for Relator's resignation in November 2013.

11. In addition to exhausting patients' Medicare Part A funds, QTC ordered Relator to lengthen therapy minutes and treatment lengths so that Defendant Facilities could bill and exhaust Medicare Part B. To this end, QTC predetermined targets that it wanted its therapists to meet, including a certain number of patients at the two highest RUG levels.

LAW OFFICES
**GOLDMAN & EHRLICH**
20 SOUTH CLARK STREET
SUITE 500
CHICAGO, ILLINOIS 60603
(312)332-6733

ARDC # 06210828

12.   Furthermore, QTC personnel frequently told Relator that she needed to adjust her evaluations so that they were more "consistent" with the physical and speech therapists' recommendations.  This was yet another example of QTC's veiled attempts to leverage Relator to adjust her evaluations which did not place patients in the two highest RUG levels.

13.   For example, on or about October 3, 2013, Ms. Chavka told Relator to change her evaluation on a patient staying at Defendant Lakeshore who she had initially evaluated in August of 2013.  Because a long period of time had elapsed since Relator had initially evaluated the patient, Relator asked whether she should reevaluate this patient.  Ms. Chavka denied Relator's request for reevaluation and ordered her to copy what the speech and physical therapists had documented.  Relator reluctantly complied with this order.  Subsequently, Relator realized that these orders, where a therapist in one discipline who was to evaluate a patient, was told to follow the prior RUG evaluations of therapists from another discipline, remained a common practice at QTC.  Relator, thereafter, refused to comply with such orders as they were just a means for getting patients to the highest two RUG levels, regardless of the proper treatment they should have received.

14.   *Even after Relator resigned*, in November of 2013, Defendant QTC continued to solicit her to change her initial evaluations for patients from months prior.  For example, on November 22, 2013, Ms. Chavka texted Relator and asked her to make "corrections" on an evaluation she performed at Westwood Manor in October of 2013. Ms. Chavka stated that it would only take 20-30 minutes, and pushed Relator to meet her as soon as possible.  When Relator asked to review the patient's file so she could reevaluate the patient to determine whether changes were necessary, Ms. Chavka refused and said she would "show [her] the corrections" that Relator had to make.  Relator refused to meet Ms. Chavka to make those changes.

LAW OFFICES
**GOLDMAN & EHRLICH**
20 SOUTH CLARK STREET
SUITE 500
CHICAGO, ILLINOIS  60603
(312)332-6733

ARDC # 06210828

24

15.     Defendant QTC solicited Relator a second time post-employment in December of 2013 to change an evaluation she made weeks prior without allowing Relator to view the patient or the patient's current files.  Notably, and similar to the previous occasion, Ms. Chavka, in a rush to make these "corrections", asked Relator to meet her the very next morning and promised "[w]e can get [these] corrections done in 15 mins."  Ms. Chavka stated that "this is standard" procedure and "[w]e only make corrections to [t]he documentation that was not accurate from prior history."  However, it remained impossible to determine that the prior history was inaccurate under these circumstances because Relator could not reevaluate the patient.  Relator again refused to make the post-employment changes.

16.     Through Defendant QTC's actions involving persistent attempts to force its therapist-employees to meet these predetermined targets and maximize therapy minutes and treatment lengths, it defrauded the Government.  In sum, the need for a significant portion of these therapy services was not supported by the patients' medical conditions.  These actions, as explained above, resulted in claims being submitted for therapy services that were false as the minutes listed included therapy that was either medically unnecessary or unskilled or both.

17.     Relator is not the only therapist, occupational or otherwise, who Defendants forced to increase therapy minutes for patients, who did not require them or who would not benefit from them, nor the only therapist who QTC ordered to perform unskilled tasks in order to maximize therapy minutes.  Numerous other therapists who worked for QTC, including Rachel Wesoloski, Jun Petalta, Lois Loredo, Vanessa de Leon, Marzieh Safarian, Whitney Thompson, Jorn Lumanog, and Jose Javier Rodriguez, who are all either occupation, speech, or physical therapists, were ordered and did perform medically unnecessary or unskilled therapy services.  Each of these individuals were required by QTC to unnecessarily increase diagnoses to the maximize minutes

LAW OFFICES
**GOLDMAN & EHRLICH**
20 SOUTH CLARK STREET
SUITE 500
CHICAGO, ILLINOIS  60603
(312)332-6733

ARDC # 06210828

25

and length of stays for the patients they saw. Relator and the above-name therapists, on several occasions, discussed QTC's orders to perform medically unnecessary or unskilled therapy services to maximize minutes billed to correspond to the highest two RUG levels on patients at Defendant Facilities.

18.     On or about June 2016, Relator while working for a subsequent company learned from her supervisor, Alycia Hinton, that Barak Baver and Safet Keljalicis, administrators at Norridge Gardens, had ordered therapists under their supervision, who had previously worked for Defendant QTC, to bill at inflated RUG rates, regardless of the actual medical necessity of the patients. This was a similar fraud to what occurred at the other Defendant facilities.

19.     Additionally, many other therapists at QTC were from the Philippines on QTC-sponsored work visas. These Philippines-born therapists feared that QTC would terminate sponsorship of their visas such that they would be returned to the Philippines if they did not comply with orders to inflate diagnoses of patients or if they refused to perform medically unnecessary or unskilled therapy services to maximize minutes billed that corresponded to the highest two RUG levels.

20.     Based upon all of the foregoing allegations and upon information and belief, the fraudulent practices described in this Complaint are representative of a pattern and practice of fraud found throughout all of Defendant Facilities and facilitated by Defendant QTC.

## COUNT I
## FALSE CLAIMS ACT
### 31 U.S.C. §3729(a)(1)(A)

21.     Relator realleges and incorporates by reference the allegations contained in the foregoing paragraphs of this Complaint.

LAW OFFICES
**GOLDMAN & EHRLICH**
20 SOUTH CLARK STREET
SUITE 500
CHICAGO, ILLINOIS 60603
(312)332-6733

ARDC # 06210828

22.    By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the United States Government for payment or approval in violation of 31 U.S.C. § 3729(a)(1)(A).

**COUNT II**
**FALSE CLAIMS ACT**
**31 U.S.C. §3729(a)(1)(B)**

23.    Relator realleges and incorporates by reference the allegations contained in the foregoing paragraphs of this Complaint.

24.    By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, to get false or fraudulent claims paid or approved by the United States Government in violation of 31 U.S.C. § 3729(a)(1)(B).

**COUNT III**
**FALSE CLAIMS ACT**
**31 U.S.C. §3729(a)(1)(C)**

25.    Relator realleges and incorporates by reference the allegations contained in the foregoing paragraphs of this Complaint.

26.    By virtue of the acts described above, Defendants conspired to commit violations of 31 U.S.C. §§ 3729(a)(1)(a), (b) in violation of 31 U.S.C. § 3729(a)(1)(C).

**COUNT IV**
**ILLINOIS FALSE CLAIMS ACT**
**740 ILL. COMP. STAT. 175/3(a)(1)(A)**

27.    Relator-Plaintiff adopts and incorporates by reference all preceding paragraphs as if fully set forth herein.

28.    By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the State of Illinois for payment or approval in

LAW OFFICES
**GOLDMAN & EHRLICH**
20 SOUTH CLARK STREET
SUITE 500
CHICAGO, ILLINOIS  60603
(312)332-6733

ARDC # 06210828

violation of 740 ILL. COMP. STATE. 175/3(a)(1)(A) and has damaged the State of Illinois by its actions in an amount to be determined at trial.

### COUNT V
### ILLINOIS FALSE CLAIMS ACT
### 740 ILL. COMP. STAT. 175/3(a)(1)(B)

1.    Relator-Plaintiff adopts and incorporates by reference all preceding paragraphs as if fully set forth herein.

2.    By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, to get false or fraudulent claims paid or approved by the State of Illinois in violation of 740 ILL. COMP. STAT. 175/3(a)(1)(B).

### COUNT VI
### ILLINOIS FALSE CLAIMS ACT
### 740 ILL. COMP. STAT. 175/3(a)(1)(C)

3.    Relator-Plaintiff adopts and incorporates by reference all preceding paragraphs as if fully set forth herein.

4.    By virtue of the acts described above, Defendants conspired to commit violations of 740 ILL. COMP. STAT. 175/3(a)(1)(A) and 740 ILL. COMP. STAT. 175/3(a)(1)(B) in violation of 740 ILL. COMP. STAT. 175/3(a)(1)(C).

### PRAYER FOR RELIEF

**WHEREFORE,** Relator prays, on behalf of the United States, the State of Illinois, and herself that, on final trial of this case, judgment be entered in favor of the United States and the State of Illinois and against Defendants, as follows:

1.    On the First Cause of Action under the False Claims Act for the amount of the United States' damages, multiplied as required by law, and for such civil penalties as are allowed by law;

LAW OFFICES
**GOLDMAN & EHRLICH**
20 SOUTH CLARK STREET
SUITE 500
CHICAGO, ILLINOIS 60603
(312)332-6733

ARDC # 06210828

2. On the Second Cause of Action under the False Claims Act for the amount of the United States' damages, multiplied as required by law, and for such civil penalties as are allowed by law;

3. On the Third Cause of Action under the False Claims Act for the amount of the United States' damages, multiplied as required by law, and for such civil penalties as are allowed by law;

4. On the Fourth Cause of Action under the Illinois False Claims Act for the amount of the State of Illinois's damages, multiplied as required by law, and for such civil penalties as are allowed by law;

5. On the Fifth Cause of Action under the Illinois False Claims Act for the amount of the State of Illinois's damages, multiplied as required by law, and for such civil penalties as are allowed by law;

6. On the Sixth Cause of Action under the Illinois False Claims Act for the amount of the State of Illinois's damages, multiplied as required by law, and for such civil penalties as are allowed by law; and

7. For the attorneys' fees and costs of this action, prejudgment interest, interest on the judgment, and for any other and further relief to which Plaintiffs, the United States and the State of Illinois, and Relator may be justly entitled.

**Jury Demand**

That a trial by jury be held on all issues.

JOSEPH, GREENWALD & LAAKE, P.A.

By:    /s/ Brian J. Markovitz

Brian J. Markovitz (Bar No: MD 15859)

LAW OFFICES
**GOLDMAN & EHRLICH**
20 SOUTH CLARK STREET
SUITE 500
CHICAGO, ILLINOIS 60603
(312)332-6733

ARDC # 06210828

bmarkovitz@jgllaw.com
6404 Ivy Lane, Suite 400
Greenbelt, MD 20770
(301) 220-2200
(301) 220-1214 (facsimile)

Law Offices of Goldman & Ehrlich, Chtd.

By:      /s/ Jonathan C. Goldman

Jonathan C. Goldman (Bar No: 06210828)
jon@goldmanehrlich.com
20 South Clark St., Suite 500
Chicago, IL 60603
312.332.6733
312.372.7076 (facsimile)

*Counsel for Relator/Plaintiff*

DATED: July 18, 2016

LAW OFFICES
**GOLDMAN & EHRLICH**
20 SOUTH CLARK STREET
SUITE 500
CHICAGO, ILLINOIS 60603
(312)332-6733

ARDC # 06210828

30